Filed 1/28/26  P. v. Cordero CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084495 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE411266) |
| SARA CORDERO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge.  Reversed and remanded.

Annie Fraser, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Eric A. Swenson, Supervising Deputy Attorney General, Kirsten Ramirez and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

After she was caught on surveillance video at a casino taking an item from a cigarette box and handing it to an individual, a jury convicted Sara Cordero of unlawfully furnishing or giving away methamphetamine (Health & Saf. Code, § 11379).[1]  The court suspended imposition of sentence and granted Cordero two years formal probation on the condition she serve 180 days in jail, which custody was stayed pending her probation's successful completion.  Cordero contends the trial court erred by allowing law enforcement witnesses to narrate and interpret the surveillance video because the testimony was improper opinion that invaded the province of the jury.  She further contends the prosecutor committed misconduct and violated the California Racial Justice Act of 2020 (the RJA; Pen. Code, § 745) by comparing her and her alleged crimes to Pablo Escobar.  Cordero admits her counsel did not object to most of the evidence or the prosecutor's statements, and so she maintains her counsel was prejudicially ineffective.  She argues the cumulative effect of the errors resulted in an unfair trial, and asks us to reverse and remand for a new trial.  We find merit in Cordero's claim of prejudicially ineffective assistance with respect to the court's admission of the law enforcement witness testimony, and therefore reverse.

FACTUAL AND PROCEDURAL BACKGROUND

In November 2021, patrol officers from a casino's tribal police department responded to a call reporting a group of individuals who were seen on surveillance video possibly selling narcotics or drugs.  Officer Kevin Hampton, who had been involved in between 50 to 100 drug-related cases, went to the scene.  After speaking with security, he detained Cordero, Carlos

---

[1]    Jurors could not reach a verdict on a count against Cordero of possessing methamphetamine for sale (Health & Saf. Code, § 11378; count 1), and on the People's motion the court dismissed that count.

2

Castellanos, and Jesus Gomez, who had all been standing at a slot machine watching Cordero play. Officers searched Castellanos but not Cordero, because they were focused on Castellanos, who had been seen discarding a black object and they had not yet seen the surveillance video. They recovered a large baggie Castellanos threw in the bushes, and also found smaller baggies on his person which were white on one side and black on the other, the white being methamphetamine. The baggies contained usable amounts of methamphetamine. Another officer searched Gomez and found a small bindle of what appeared to be drugs. Cordero was released at the scene without a search of her bag, coat or the cigarette box.

Officer Hampton explained "Cordero's involvement in this case" after officers had watched the surveillance video: "We saw Ms. Cordero take a small baggie of what I believed to be methamphetamine from a—I believe it was a Marlboro Reds cigarette box and give it to Castellanos, which, in turn, he gave it to a customer." The prosecutor asked why Officer Hampton referred to that other person as a customer, and he answered: "Because it's—they're going to buy a product, which is the methamphetamine that they're selling." The officer's belief that the substance was methamphetamine was based on a presumptive drug test he conducted, which was positive for methamphetamine, as well as a later laboratory analysis of the baggies they recovered from Castellanos. The laboratory analysis showed that the items recovered from Castellanos contained methamphetamine.

At trial, the prosecutor played the surveillance video for Officer Hampton to explain to the jury what he was seeing. The officer testified the video showed that Cordero handed Castellanos a small black baggie from inside the cigarette box, then Castellanos walked over to a female customer to make the exchange. With his attention directed to Castellanos's right arm,

3

Officer Hampton testified that Castellanos made an exchange, meaning he made a sale, giving the black baggie with methamphetamine to the female in front of him.[2]  Using a website tool, Officer Hampton also zoomed in the video and slowed it down to look at Cordero's and Castellanos's actions.  He testified Cordero was digging through the cigarette box, and pulled out a baggie which was black on one side and clear on the other, showing the methamphetamine.[3]  Officer Hampton testified that Cordero was initially interviewed and released, but they saw her involvement after watching the surveillance video.  According to the officer, in his experience, people buying methamphetamine do not always pay with cash, but also through payment applications.

San Diego Deputy Sheriff and Detective Steven Sepulveda had specialized training in detecting narcotics and sales, and was a narcotics

---

[2]    The prosecutor asked:  "So as [the video is] playing, Officer Hampton, what just occurred at the bottom of the screen down here?"  Officer Hampton answered:  "Ms. Cordero had taken the small black baggie out of the cigarette container and handed it off to Mr. Castellanos.  Mr. Castellanos then proceeded to walk over to his customers to make the exchange."  He was asked:  "[W]hen you say an exchange is being made, what does that mean?"  He answered, "That means that a sale has been made.  He is giving the black baggie with the methamphetamine to the other guest or the female in front of him."

[3]    Officer Hampton was asked:  "Can you let us know what's happening between Ms. Cordero and Mr. Castellanos."  He answered:  "So this is Corderos [sic] with his right hand is reaching over.  At this point in time, Ms. Cordero is digging through her cigarette box, and she will be pulling out a black—black on one side and clear on the other side baggie with—the white part that you see in that frame was the clear side of the bag, which showed the methamphetamine."  The prosecutor showed Officer Hampton a photograph of the baggies recovered from Castellanos that were "white being the meth on one side and the black on the other," and he confirmed that was what he was referring to.

4

expert. He testified about types and methods of drug sales, where dealers work in concert with others and buyers. He testified based on his training and experience that casinos in San Diego were often used by drug trafficking organizations to conduct business due to the large number of addicted individuals who would go to gamble and buy drugs. Detective Sepulveda reviewed the surveillance footage and photographs relating to Cordero, and testified from watching the video that it was clear "Cordero handed over to another individual from a box of cigarettes a baggies [*sic*] what was later found to be methamphetamine. So it was essentially clear to me that it was a drug deal." Detective Sepulveda explained that he had investigated or been part of the investigation into over five hundred drug sales, which he saw both on surveillance and in person. He testified that what he saw with regard to Cordero was "typical of a drug deal that I have seen throughout my career."[4]

Playing the surveillance video, the prosecutor asked Detective Sepulveda: "And so about a minute after Ms. Cordero handed what you suspect to be meth to this person in the black ball cap, one minute later he is now handing something to this female. And what does it appear to be happening based on your training and experience?" Without objection, Detective Sepulveda responded: "Clearly, to me, what happened in this video or what I'm seeing is the drugs are now going to the intended recipient."

---

[4] At one point, the prosecutor showed Detective Sepulveda a still frame from the video (trial exhibit No. 8) and asked: "As we're looking at that photo, I'm going to hold up these baggies right here. It is your opinion, based on your training and experience, you know, after seeing hundreds of drug sales in person, that what's being handed from Ms. Cordero to this other person is actually one of these baggies of methamphetamine?" Defense counsel objected that the question "[t]akes out of the province of the jury" [*sic*], and the court sustained the objection.

DISCUSSION

Cordero contends that the trial court prejudicially erred by permitting Officer Hampton and Detective Sepulveda to narrate what they believed they saw on the surveillance video, allowing them to draw conclusions that she was involved in a drug deal and handed methamphetamine to Castellanos. She maintains the testimony lacked foundation, was both speculative and improper opinion, and "went well beyond drawing reasonable inferences from facts they observed and crossed the line into improperly interpreting facts for the jury" so as to invade the jury's province and violate her rights to due process and a fair trial. Cordero further contends the prosecutor committed misconduct and violated the RJA by repeatedly referencing Pablo Escobar, and comparing her to Escobar, a Columbian drug lord who headed the Medellin drug cartel. She characterizes the prosecutor as using racially discriminatory language about her that violates the RJA.

As to both of these contentions, Cordero admits her counsel did not object to most of the evidence and argument, and thus she argues he provided constitutionally ineffective assistance. Absent objections on the asserted grounds on appeal, Cordero has forfeited her claims. (Evid. Code, § 353 ["A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"]; see *People v. Flinner* (2020) 10 Cal.5th 686, 726 ["a defendant forfeits an argument on appeal where [s]he fails to object at all to the evidence in the trial court or when [s]he objects on substantively distinct grounds"]; *People v. Wilson* (2025) 111 Cal.App.5th 1020, 1030 [defendant forfeited claim of prosecutor misconduct in closing

6

argument, including based on an asserted violation of the RJA, by failing to assign misconduct and request a jury admonishment].) Cordero does not argue objections would have been futile, nor would they have been, as the court sustained some of counsel's objections (see footnote 4, *ante*).

We will analyze her arguments through the lens of an ineffective assistance of counsel claim, so we summarize those principles.

### I. *Ineffective Assistance of Counsel Legal Principles*

" ' "To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' " (*People v. Rices* (2017) 4 Cal.5th 49, 80; see *Strickland v. Washington* (1984) 466 U.S. 668, 694.)

" 'In determining whether counsel's performance was deficient, we exercise deferential scrutiny. [Citations.] The appellant must affirmatively show counsel's deficiency involved a crucial issue and cannot be explained on the basis of any knowledgeable choice of tactics.' " (*People v. Loza* (2012) 207 Cal.App.4th 332, 351.) We presume counsel's performance fell within the wide range of professional competence and that his or her actions and inactions can be explained as a matter of sound trial strategy. (*People v. Aguirre* (2025) 18 Cal.5th 629, 679.) " 'When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was " ' "no conceivable tactical purpose" ' for counsel's act or omission." ' " (*Ibid.*; see also *People v. Mickel* (2016) 2 Cal.5th 181, 198.)

II. *Testimony of Officer Hampton and Detective Sepulveda*

" ' "[A]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel[.]" ' " (*People v. Gurule* (2002) 28 Cal.4th 557, 609-610; see also *People v. Torres* (1995) 33 Cal.App.4th 37, 48 (*Torres*) [counsel's decision not to object is generally a matter of trial tactics].) This is the rare case where there is no satisfactory explanation for counsel's failure to object to the testimony of Officer Hampton and Detective Sepulveda concerning whether a drug exchange took place and Cordero's involvement. As we explain below, the testimony constituted opinions both as to guilt and as to whether a crime was committed, both improper whether considered lay or expert testimony.

"A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] 'Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77, citing *Torres, supra,* 33 Cal.App.4th at p. 47 and *People v. Brown* (1981) 116 Cal.App.3d 820, 827-829 (*Brown*); see also *People v. Duong* (2020) 10 Cal.5th 36, 61 [trial court properly excluded proposed expert testimony that certain wounds were "accidental" and essentially that the defendant lacked the required intent, which was " 'tantamount to expressing an opinion as to defendant's guilt' [citation] because it proposed to dispose of an essential element of the crime"].)

In *Torres*, a police officer described at trial how certain street gangs used the term "collecting rent" and how it worked. (*Torres, supra,* 33

Cal.App.4th at p. 43.) The defendant had shot an individual in the course of collecting payments or "rent" from drug dealers. (*Id*. at p. 42.) Without objection by defense counsel, the officer was asked to describe the term, and stated, "Well, I would describe it as a robbery. My definition of a robbery is taking of someone's personal property through force or fear with the immediate danger of something happening to you. I know that is taking place. *That is what happened in this particular case . . . .*" (*Id*. at p. 44.) The Court of Appeal held defense counsel was deficient in failing to object to this testimony, as the officer's "opinions . . . as to the definitions of robbery and extortion, the nature of the crime committed here, and his inferential opinion as to defendant's guilt were all improper." (*Id*. at p. 48.) The opinions went to a crucial issue of whether the defendant killed the individual in the course of an attempted robbery, which would constitute a special circumstance and support a first degree felony-murder verdict. (*Id*. at p. 49.) There was no tactical advantage to allowing the testimony to go unchallenged; "[g]iven the importance of the jury's determination on this issue, we cannot believe competent counsel would not object to [the officer's] opinion." (*Ibid*.)

The *Torres* court, however, found the defendant did not establish his counsel's failure affected the trial's outcome. (*Torres*, *supra*, 33 Cal.App.4th at p. 49.) The evidence was undisputed that the defendant was a "collector of 'rent' " for a gang (*id*. at p. 50) and the remaining evidence supported a finding on all the elements of attempted robbery, but negated a necessary element of extortion, thus the jury could not have reasonably reached any other conclusion than the defendant's acts were attempted robbery. (*Id*. at pp. 51-52.)

In *Brown*, *supra*, 116 Cal.App.3d 820, the Court of Appeal held improper an experienced narcotics officer's testimony that the defendant was

9

working as a "runner" for a particular person. (*Brown,* at p. 829.) Though such officers could properly testify as to what certain statements or terms meant in the context of drug transactions ("Are you looking" as meaning do you wish to purchase drugs, a "bag" meaning a certain quantity of drugs, or what is a "runner"), the officer went on to describe "the role [the defendant] was playing in the transaction" on the day in question, stating, " '*It's my opinion that the defendant . . . was working as a runner for Lucille Carson.*' " (*Id.* at pp. 828-829.) Pointing out the term "runner" had been defined for the jury, the *Brown* court reasoned: "Under the instructions given by the trial court a 'runner,' as defined by the officer, was *necessarily* as guilty as the person to whom he directed another for the purchase of heroin. The latter answer given by the officer was tantamount to an opinion that [defendant] was guilty of the charged crime." (*Id.* at p. 829.) Thus, the jurors were just as qualified as the witness to determine whether Brown was working as a runner. (*Id.* at p. 829)

Contrast these circumstances with those in *People v. Son* (2020) 56 Cal.App.5th 689, in which a detective was permitted to testify about what she observed from surveillance video showing the defendant assaulting a victim. (*Id.* at p. 696.) The detective testified she had viewed the video more than 50 times, and that it was difficult to discern events because of "so much going on" and "so much movement." (*Id.* at p. 695.) She explained that later viewings revealed additional details, such as a shiny object (later characterized as "a stabbing instrument") fly out of the defendant's hand during the assault. (*Id.* at p. 695.) The defendant challenged the testimony as inadmissible lay opinion testimony. (*Id.* at p. 696.) The court rejected the claim: "[W]e fail to see any opinions expressed in [the detective's] testimony. She essentially just testified to what she saw . . . ." (*Id.* at p. 697.) The court

10

held that even assuming the testimony was opinion, the trial court properly found it was helpful to the jury, as it enabled it "to speed up the process of teasing out obscure details in the video." (*Ibid.*)

This is not a situation where Officer Hampton and Detective Sepulveda merely assisted the jury in discerning details in the surveillance video, such as whether the object passed by Cordero to Castellanos was consistent with the baggies of what was later found to be methamphetamine or to notice things jurors might have missed. (*People v. Son, supra*, 56 Cal.App.5th at p. 697.) Officer Hampton's testimony went beyond such observations to express opinions about "Cordero's involvement in this case," stating she took methamphetamine from the cigarette box and gave it to Castellanos who transferred it to the customer, who was there to buy "the methamphetamine that they're selling." Detective Sepulveda testified based on his review of the video that "it was essentially clear to me that it was a drug deal" and what he saw with regard to Cordero was "typical of a drug deal that I have seen throughout my career." These opinions were not helpful to the jury, because they in effect expressed an opinion on Cordero's guilt. Notably, when counsel did object to the prosecutor's question seeking Detective Sepulveda's opinion "that what's being handed from Ms. Cordero to this other person is actually one of these baggies of methamphetamine," the trial court sustained the objection as invading the jury's province.

The People do not address defense counsel's performance in failing to object to this testimony. They argue instead that there is no reasonable probability that but for counsel's error, the result of the trial would be different. They argue Officer Hampton's and Detective Sepulveda's testimony about Cordero engaging in a drug deal or drug sale was not prejudicial because Cordero was not convicted of possessing

11

methamphetamine for sale. And further, they argue, the testimony that Cordero handed Castellanos a baggie of methamphetamine did not affect the outcome "because there was strong circumstantial evidence that [she] actually gave Castellanos methamphetamine." The People point to the video exhibits, and say it would have been clear to jurors that Cordero "pulled an item out of a cigarette box that was not a cigarette, handed it to Castellanos, and he in turn immediately had a conversation with a man and woman before handing the women an item," then "[a] short time later . . . while being stopped by [police, the video] clearly shows Castellanos surreptitiously tossing an item from his pocket which was subsequently determined to be two large baggies of methamphetamine." The People point to Officer Hampton's testimony that the surveillance video showed Cordero "take a little black baggie that matched the description of the baggies that Castellanos was in possession of and give it to Castellanos."

We are not convinced. The question is whether Cordero has shown " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People v. Aguirre*, *supra*, 18 Cal.5th at p. 706.) We see such a reasonable probability on this record. The police did not search Cordero or her purse, they released her at the scene, and they did not track down and search either the woman who was handed the supposed methamphetamine or her companion. Though Castellanos apparently used a phone for the drug sale, police did not seize his phone to look for evidence of the transaction. We have viewed the video evidence. Two videos show different views of Cordero handing Castellanos a small item from a cigarette box. In one video the item is turned on its side, so it is not clear what the object is. It is not any more clear in the second overhead video. We cannot describe the circumstantial evidence against

12

Cordero as overwhelming so as to find counsel's error would not have affected the outcome. The error requires reversal.

### III. *Claim of Prosecutor Misconduct*

Despite reversing the judgment, we briefly address Cordero's claim of prosecutor misconduct in the event of retrial. (See *People v. Barnes* (2024) 107 Cal.App.5th 560, 593 [error of an "evidentiary nature" allows retrial].) Cordero contends the prosecutor committed prejudicial misconduct during statements made during voir dire, opening statements and closing arguments. Pointing out she is Hispanic, Cordero argues the references were "racially coded and improper," and an appeal to racial bias.[5] According to her, the only explanation for the comparison was to "infer that . . . due to her race, ethnicity or national origin, [she] was associating with drug dealers, and engaging in drug sales." Cordero argues a reasonable attorney would have objected to the prosecutor's references, and her counsel was prejudicially ineffective for not doing so.

### A. *Background*

During voir dire, the prosecutor told the jury that following the law "doesn't come as easily as we like to think," and read a jury instruction stating that to sell, furnish or give away a controlled substance, it was "enough that that person has control over it or the right to control it, either

---

[5] Penal Code section 745, subdivision (h)(4) provides: " 'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (See also *People v. Wilson*, *supra*, 111 Cal.App.5th at p. 1031.)

personally or through another person." The prosecutor continued: "So basically, what that means is—I don't know if anyone is watching Narcos or watches those old drug documentaries they do on Pablo Escobar, any of that kind of stuff. Some people find it fascinating and some people, it puts them to sleep; but in the '80's—and I'm actually from Miami originally—the Colombian cartels, they would take planes. They would load them up with cocaine.

"They would drive these planes, fly them—not Pablo Escobar himself. He would have someone else do it. Someone on payroll. They would fly a plane, and they would just drop cocaine in the ocean off the coast of the Bahamas.

"They would just have these planes fly through the Gulf Stream, and just open the doors and just kick out cocaine with little trackers on them. And then boats would go by, and they'd find the tracking devices using some sort of corresponder or transmitter. Drive up to the cocaine packages. Put them on a boat, and then take a boat in with the cocaine to the coast of Florida.

"Now, Pablo Escobar wasn't in the plane. Pablo Escobar, obviously, wasn't holding the cocaine. He wasn't even on the boats, but Pablo Escobar was dealing drugs. He was selling cocaine.

"This law is saying that you can be convicted, and, in fact, you should be. The law is saying you must if it's proven beyond a reasonable doubt, which is my burden."

The prosecutor asked jurors if anyone disagreed or could not follow that law. He remarked: "Pablo Escobar leaves his drugs at some stash house. It's not his house, but we know he controls it. Is there anyone here who has a problem with convicting Pablo Escobar for drugs before any case? Who feels

uncomfortable with that?" The prosecutor proceeded to ask each juror if they were "okay with that law" and if it "makes sense . . . ."

The next reference occurred during the prosecutor's opening statements. He told the jury that Cordero was helping Castellanos sell methamphetamine and that he had video evidence to prove it. After playing the video, the prosecutor explained that he would present a criminalist as well as a narcotics sales expert to discuss how people work together when they sell drugs. He stated: "The narcotics expert is going to explain that, you know, a lot of times what people do—and no one is saying that Ms. Cordero is Pablo Escobar, right, but what they're saying is, a lot of times people will sell drugs to support their own addiction or their own habits. One person may have smaller baggies on them. One person may have more of the bulk, right, but in the narcotics expert's training and experience, their experience on the job, they see people who sell to support their own habits, right." The prosecutor summarized the expert's testimony; that the expert would tell them that "in a situation like this, this is pretty standard as to how it goes down. One person may have smaller baggie amounts. They'll hand it off to someone else. They'll kind of keep a view or a lookout. The other person will go off and sell it." He explained there was no evidence that Cordero had drugs on her or that she was in charge: "So you're not going to hear evidence in this case that Ms. Cordero had 100 grams of methamphetamine. You're not going to hear evidence that Ms. Cordero is the one who's directing the whole show, that she's in charge or something to that effect. It's just going to be as simple as what you see in the videos, what you're going to see in these photos, and what you're going to hear in testimony, is that she gave Mr. Castellanos a little baggie of meth. She clearly knew what was going on.

And by doing that, she's selling methamphetamine. And in conjunction, she's giving it away. That's essentially the case."

The final reference occurred toward the end of the prosecutor's closing arguments, when he summarized the elements of the charges in the case. He said: "Selling methamphetamine. That's the first one. Here are the elements. Count 1, the defendant possessed the controlled substance. So did she actually have it at some point? [¶] We talked about Pablo Escobar with possession. You don't actually have to hold it to possess it. What I mean by that is, she hands it off to someone else, Mr. Castellanos with the black hat, and then he actually gives it to the woman who purchases it, right, but she still has possession of it. The same way that . . . Pablo Escobar does when he takes his cocaine and puts it on a plane—" The court sustained defense counsel's objection to the "use of Pablo Escobar" as "inflammatory" and told the prosecutor to move on. Later, defense counsel again objected to a slide showing Escobar, during the prosecutor's remarks that Cordero knew it was methamphetamine and it was a usable amount. The court overruled defense counsel's objection, "There's the Pablo Escobar."

B. *Counsel Was Not Ineffective for Failing to Object to the Prosecutor's Remarks*

As a threshold matter, we do not see the prosecutor's references to Pablo Escobar, which began as an example of control for purposes of the furnishing offense, implicitly appealing to racial bias. Indeed, the prosecutor emphasized at one point that he was not comparing Cordero to Escobar. The brief references were not a pattern of conduct " ' " 'so egregious that it infect[ed] the trial with such unfairness as to make the conviction a denial of due process' " ' " or " ' " ' "the use of deceptive or reprehensible methods to attempt to persuade . . . the jury." ' " ' " (*People v. Aguirre, supra,* 18 Cal.5th

16

at pp. 706-707.)  Rather, the use of Escobar was an " ' " 'illustration[ ] drawn from . . . history' " ' " (*id.* at p. 707) well within the " ' " 'wide latitude' " ' " given to prosecutors during argument.  (*Ibid.*)

Thus, it was not ineffective for counsel to withhold objections to the argument.  More generally, mere failure to object to argument " ' "seldom establishes counsel's incompetence." ' " (*People v. Aguirre, supra,* 18 Cal.5th at p. 707.)  *Aguirre* explains:  " 'Representation does not become deficient for failing to make meritless objections' [citation] and there may be valid reasons why counsel may choose not to make even a meritorious objection [citations].  As one court has explained, 'From a strategic perspective, . . . many trial lawyers refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality.' [Citation.]  Other tactical reasons to refrain from raising even valid claims of error in the presentation of argument can include the interest in not drawing additional attention to, or inviting elaboration on, comments made by opposing counsel . . . ." (*Id.* at p. 707.)

In short, the prosecutor's references were not "so apparent and impactful absent corrective measures as to render a failure to object ineffective assistance." (*People v. Aguirre, supra,* 18 Cal.5th at p. 707.)

## DISPOSITION

The judgment is reversed and remanded for further proceedings.

O'ROURKE, Acting P. J.

WE CONCUR:

CASTILLO, J.

RUBIN, J.